**Opinion filed August 29, 2025**



**In The**

# Eleventh Court of Appeals

_____

**No. 11-25-00055-CV**

_____

## IN THE INTEREST OF L.M.R, C.N.H., C.J.H., AND C.O.H., CHILDREN

**On Appeal from the 446th District Court**
**Ector County, Texas**
**Trial Court Cause No. E-23-032-PC**

### M E M O R A N D U M   O P I N I O N

Appellant-mother appeals the trial court's order terminating her parental rights to her children, L.M.R.,[1] C.N.H., C.J.H., and C.O.H.[2]  On appeal, Appellant challenges the sufficiency of the evidence to support the trial court's findings that she endangered the children under Section 161.001(b)(1)(D) and (E) of the Texas

---

[1]L.M.R. does not share a biological father with her younger siblings, C.N.H., C.J.H., and C.O.H. The associate judge terminated the parental rights of both fathers in the underlying proceeding, and neither sought de novo review nor appealed the termination order.

[2]We use initials to refer to the children.  *See* TEX. R. APP. P. 9.8(b).

Family Code, and the sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (b)(2) (West Supp. 2024). We affirm the trial court's order.

*Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. FAM. § 161.001(b). To terminate one's parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(V), and that termination is in the best interest of the children. *Id.* § 161.001(b)(2). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2019).

In this case, the trial court found that clear and convincing evidence established that Appellant: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for Appellant to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services (the Department) for not less than nine months as a result of the children's removal under Chapter 262 for abuse or neglect. *See id.* § 161.001(b)(1)(D), (E), (O). The trial court further found, pursuant to Section 161.001(b)(2), that termination of

2

Appellant's parental rights was in the children's best interest. *See id.*
§ 161.001(b)(2).

In reviewing a legal sufficiency challenge, we must decide whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). Cognizant of the required appellate deference to the factfinder, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotation marks omitted). "However, we may not disregard 'undisputed facts that do not support the finding,'" and the factfinder is "the sole arbiter of the witnesses' credibility and demeanor." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) then quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). As such, when considering the credibility of the evidence presented, we may not substitute our judgment for that of the factfinder. *J.F.-G.*, 627 S.W.3d at 316.

In assessing whether the evidence is factually sufficient, we weigh the disputed evidence that is contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *In re L.C.C.*, 667 S.W.3d 510, 512 (Tex. App.—Eastland 2023, pet. denied). Because a trial court conducting a de novo hearing "may also consider the record from the hearing before the associate judge," we may so do as well if it is included in the appellate record, as it is here. *See* FAM. § 201.015(c) (West 2020); *In re A.L.M.-F.*, 593 S.W.3d 271, 277 (Tex. 2019) ("[R]eview under

3

[S]ection 201.015 is not entirely independent of the proceedings before the associate judge.").

With respect to the best interest of the children, no unique set of factors need be proved. *L.C.C.*, 667 S.W.3d at 513; *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). Further, the best interest determination does not restrict the proof to any specific factor or factors. *In re J.S.*, 687 S.W.3d 541, 547 (Tex. App.—Eastland 2024, no pet.). However, courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

To support a best-interest finding, the Department is not required to prove each *Holley* factor; in some circumstances, evidence of the presence of only one factor will suffice. *C.H.*, 89 S.W.3d at 27; *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). Additionally, the same evidence that proves one or more statutory grounds for termination may also constitute sufficient, probative evidence illustrating that termination is in the children's best interest. *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that

termination is in the children's best interest, particularly if the evidence indicates that the parent-child relationship and the parent's conduct has endangered the safety and well-being of the children. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the children, not the parent. *J.S.*, 687 S.W.3d at 548; *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet. denied) (citing *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.)).

In this regard, the factfinder may measure a parent's future conduct by his or her past conduct in determining whether termination of the parent-child relationship is in the children's best interest. *J.S.*, 687 S.W.3d at 548; *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The factfinder may infer that a parent's past conduct that endangered the safety and well-being of the children may recur in the future if the children are returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied). Additionally, the factfinder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness by the parent to meet the children's physical and emotional needs in the future. *J.D.*, 436 S.W.3d at 118; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.).

*The Evidence Presented at Trial*

In September 2022, Appellant and the father[3] moved from Florida to Odessa with seven-year-old L.M.R., six-year-old C.N.H., three-year-old C.J.H., and two-

---

[3]We refer to Appellant's husband and the father of C.N.H., C.J.H., and C.O.H. as "the father"; L.M.R.'s biological father had been incarcerated for four years by the time of the initial hearing and he was largely uninvolved in her life.

5

year-old C.O.H. They lived with the father's uncle, Christopher Jonathan Larkin, until December 2022 when Larkin took the entire family to "the middle of nowhere and just left [them] to fend for [themselves]." They purportedly moved into a fifth wheel recreational vehicle (RV) that had no electricity or running water that was located on a property with several other abandoned structures and trash everywhere. In June 2023, the Department briefly investigated reported concerns over the family's living arrangement. Appellant and the father misrepresented that they planned to move back to Florida on June 24; the family was placed in a hotel at the Department's expense, and the case was closed. Shortly thereafter, the family returned to the RV.

In July 2023, Appellant and the father were caught shoplifting while they had C.O.H. and C.J.H. with them. When they were arrested for misdemeanor theft, Appellant called Larkin to care for the children while she and the father were in jail. According to Appellant, she called Larkin despite his previous behavior because she wanted to avoid involvement by the Department. Law enforcement and the Department learned two days later that Larkin abandoned the children in a large metal shed-type structure[4] on the same property as their RV. The shed, like the RV, had no air conditioning, electricity, water, or food, and the children were without shoes or extra clothes. Department investigator Adrian Campos observed additional safety hazards in the shed and on the property, such as buckets of oil, gas containers, shards of glass, trash, old tires, and a broken-down truck. Campos also entered Appellant's and the father's RV on the property, which was filled with clothes, and had no bathroom and nowhere to sleep. In fact, Campos found no running water in any of the surrounding structures on the property.

---

[4]The building is referred to as a "shed" and "shop" interchangeably throughout the record. The photographs of where the children were found show a primitive industrial shed-type outbuilding that could have previously functioned as a mechanic shop. We will hereinafter refer to the structure as a shed.

Campos spoke to the children after they were transported to the hospital. He observed that they were very hungry and thirsty, their skin was "matted in dirt," and they were covered in bites, cuts, and other marks. It also appeared that the children "hadn't been bathed in much longer than just two days since the parents had been arrested."

Following their discharge from the hospital, the children stayed in a shelter before being placed in three separate therapeutic foster homes across Texas. Department caseworker Christi Wooten met with the children a month after removal. By that time, "all their wounds were clean, all their infections . . . [t]he lice, the scabies, all of that was taken care of." However, Wooten described the children's behaviors as "the most severe significant behaviors that [she has] ever experienced in any child in any case" in her eleven years with the Department. When she transported C.N.H. from the shelter to the placement in Houston, C.N.H. "punched, hit, kicked, spit, bit, called [her] names on the plane," and ran away when they walked off the plane into the airport. All four children were diagnosed with post-traumatic stress disorder (PTSD). L.M.R. has additional diagnoses of autism, oppositional defiant disorder (ODD), and attention deficit disorder (ADD). C.J.H. also has autism, and the three boys each have attention deficit hyperactive disorder (ADHD) of varying extremes.

Appellant was released from jail a week after her arrest. The Department created a family plan of service for Appellant, which the trial court approved and made an order of the court on August 30, 2023. As part of the service plan, Appellant was required to complete individual counseling, attend all scheduled supervised parent-child visitation, submit to monthly drug testing, refrain from criminal activity, obtain and maintain employment, and establish a safe and stable home environment.

In September 2023, Appellant pleaded guilty to her theft charge, was convicted thereof, and was placed on community supervision. She was arrested in February 2024 for violating several of her community supervision conditions, and remained confined until June 2024 because her probation was revoked. On May 14, 2024, Appellant was transported from the Ector County Detention Center to the initial termination hearing before the associate judge. Following the presentation of evidence, the associate judge terminated the parental rights of Appellant and both fathers. Appellant timely sought de novo review before the referring court, and the de novo hearing was conducted on February 21, 2025.

By the time of the de novo hearing, L.M.R. was ten, C.N.H. was nine, C.J.H. was five, and C.O.H. was four years old. The referring court admitted into evidence the reporter's record and exhibits from the hearing before the associate judge. The referring court heard that Appellant tested positive for methamphetamine in November 2023, which was the only time she submitted to drug testing while the case was pending. Appellant admitted to her probation officer in January 2024 that she used methamphetamine, but subsequently claimed that her admission was coerced. She maintained that she tested positive due to "hanging around people that were using" methamphetamine, and eventually revealed that Larkin was the methamphetamine user responsible for her positive results. On cross-examination during the de novo hearing, Appellant ultimately admitted that she knowingly put her children's safety at risk by placing them in Larkin's care.

Appellant purportedly missed her drug tests due to a lack of transportation, then claimed that Wooten had not messaged her to drug test "in a few months." However, Wooten provided bus passes to Appellant, and the Department introduced screenshots of text messages from Wooten to Appellant directing her to submit to drug testing as recently as January 31 and February 10, 2025. The referring court

8

ordered Appellant to submit to drug testing after she testified at the de novo hearing, which yielded positive results for methamphetamine and opiates.

Appellant has not maintained employment, and only attended four out of ten counseling sessions. According to her counselor, she never accepted responsibility for the removal of her children, and instead assigned culpability to Larkin. And while Appellant attended most of her virtual visits, the parents' phone batteries often died mid-visit, and they had recurring issues with their internet connection. During visits, Appellant had difficulty redirecting the children during their meltdowns, and ignored the visitation supervisor's guidance. After the visits with Appellant, L.M.R. frequently wet the bed, and even wet herself while sitting in her chair during two virtual visits.

Wooten testified that, despite repeatedly asking Appellant for her home address throughout the case, Appellant never disclosed that information. Consequently, Wooten was never able to assess the safety or appropriateness of Appellant's residence. Wooten further attested that she has had difficulty communicating with Appellant. Appellant cursed and screamed at her during a jail visit, hung up on her the day before the de novo hearing, and has continued to fault others for the children's removal. Wooten opined that terminating Appellant's parental rights was in the children's best interest. Wooten explained that returning the children to Appellant would put their safety at risk, and the children would not have their basic needs met.

At the conclusion of the hearing, the referring court terminated Appellant's parental rights under Section 161.001(b)(1)(D), (E), and (O), and found termination to be in the best interest of the children. *See* FAM. § 161.0001(b)(1)(D), (E), (O), (b)(2). This appeal followed.

*Section 161.001(b)(1)(D) and (E) – Endangerment*

In her first issue, Appellant challenges the trial court's findings that she endangered the children. *See id.* § 161.001(b)(1)(D) and (E). Although only one statutory ground is necessary to support termination, appellate courts must address a parent's challenges to a trial court's findings under subsections (D) or (E), as they may have implications for the parent's rights to other children. *See* FAM. § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d 230, 234–35 (Tex. 2019) (addressing due process and due course of law considerations with respect to appellate review of grounds (D) and (E) and holding that an appellate court must provide a detailed analysis if affirming the termination on either ground). Thus, if we conclude that the evidence is legally and factually sufficient to uphold the trial court's finding as to either subsection (D) or (E), we need not address the remaining subsections. *See* FAM. § 161.001(b)(1); TEX. R. APP. P. 47.1. And when the evidence pertaining to both subsections (D) and (E) is interrelated, as it is here, we may conduct a consolidated review of the trial court's endangerment findings. *See In re A.L.S.*, 660 S.W.3d 257, 263–64 (Tex. App.—San Antonio 2022, pet. denied); *J.D.*, 436 S.W.3d at 114; *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.).

The statutory endangerment grounds require clear and convincing proof that the parent has: "(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," or "(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." FAM. § 161.001(b)(1)(D), (E); *In re S.M.R.*, 434 S.W.3d 576, 585 (Tex. 2014). "[E]ndangerment encompasses a larger array of conduct that 'expose[s a child] to loss or injury' or 'jeopardize[s]' the child." *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533

(Tex. 1987)). The term means "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," but "does not require actual harm." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *see R.R.A.*, 687 S.W.3d at 277 (citing *Boyd*, 727 S.W.2d at 533).

To terminate a parent's rights for endangerment under subsections (D) or (E), the "parent's endangering conduct need not 'be directed at the child,'" nor must "the child actually suffer[] injury." *R.R.A.*, 687 S.W.3d at 277 (quoting *Boyd*, 727 S.W.2d at 533); *In re C.E.*, 687 S.W.3d 304, 310 (Tex. 2024). "[T]ermination under [subsection] (D) requires that the child's environment is a source of endangerment, and the parent's conduct may create that dangerous environment." *C.E.*, 687 S.W.3d at 310. "A parent's drug use, violence, or other abuse may make the child's environment endangering to the child." *In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.). "A parent acts 'knowingly' when the parent is aware that the environment creates a potential danger to the child but the parent disregards that risk." *Id.* Because conditions or surroundings cannot endanger children unless the children are exposed thereto, the relevant time frame for evaluating subsection (D) is before the children's removal. *J.W.*, 645 S.W.3d at 749.

Endangerment under subsection (E), in contrast, focuses on the parent's conduct, and whether the endangerment of the children's well-being was the direct result of the parent's acts, omissions, or failures to act. *J.S.*, 687 S.W.3d at 550. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.S.*, 687 S.W.3d at 550; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). "A factfinder may infer endangerment from 'a course of conduct' that presents substantial risks to the child's physical or emotional well-being." *R.R.A.*, 687 S.W.3d at 277. A parent's actions prior to and after the

children's removal may show an endangering course of conduct. *See J.S.*, 687 S.W.3d at 550 ("[E]ndangering conduct may include a parent's actions before the child's birth and may relate to the parent's actions while the parent had possession of other children."). "Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being." *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (Illegal drug use and offenses that occurred before the child's birth may be considered as part of a course of conduct that endangers a child.).

Appellant's own testimony established that she engaged in endangering conduct and knowingly allowed the children to remain in an endangering environment. *See J.F.-G.*, 627 S.W.3d at 311–12; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). It is undisputed that the children were endangered while in Larkin's care. They were left in an abandoned shed without air conditioning or electricity in the summertime, and had no food, water, or spare clothes. They were found covered in dirt, bruises, scabs, bug bites, and head lice. Failing to remove a child from an endangering environment can support termination under subsection (D) if the parent is aware of the dangerous conditions or surroundings. *See J.G. v. Tex. Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.); *In re A.L.H.*, 468 S.W.3d 738, 746 (Tex. App.—Houston [14th Dist.] 2015, no pet.). According to Appellant, Larkin abandoned her, the father, and the young children in the middle of nowhere once he decided that he no longer wanted to help them. Appellant also attributed her positive drug test results to exposure through Larkin's methamphetamine use. Appellant's characterization of Larkin belies her attempt to elude culpability for leaving the children with Larkin. Appellant therefore

cannot maintain ignorance to circumvent a finding that she placed her children with a person who engaged in endangering conduct. The trial court reasonably concluded that Appellant endangered the children's physical or emotional well-being by placing them in Larkin's care. *See In re N.L.S.*, 715 S.W.3d 760, 765–66 (Tex. 2025) (citing *J.F.-G.*, 627 S.W.3d at 315). And her choice to do so simply to avoid involvement by the Department demonstrates her unwillingness to prioritize the safety and well-being of her children above her own. *See In re M.S.*, 662 S.W.3d 620, 630–31 (Tex. App.—Beaumont 2023, pet. denied) (in addition to "domestic violence concerns," the father left his children with the mother "when he knew something was wrong with her"); *In re K.G.*, No. 11-24-00236-CV, 2025 WL 477650, at *5–6 (Tex. App.—Eastland Feb. 13, 2025, no pet.) (mem. op.) ("A parent's decision to leave a child in the care of a known drug user subjects the child to a life of uncertainty and instability that endangers the child's physical and emotional well-being."); *E.G. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00469-CV, 2022 WL 17970222, at *9 (Tex. App.—Austin Dec. 28, 2022, no pet.) (mem. op.) (the father endangered the child by leaving the child with the mother, whom he knew to be a methamphetamine user).

Appellant not only endangered her children by placing them in Larkin's care—the evidence demonstrates that she knowingly exposed the children to unsafe and inappropriate living conditions that endangered their physical and emotional well-being. Following the Department's investigation in June 2023, Appellant was aware that the RV without running water, electricity, a bathroom, or anywhere to sleep was unsuitable and unsafe for the children. Rather than being forthcoming with the Department and prioritizing the safety of her children, she and the father lied about moving back to Florida, and returned to the RV after the Department closed its investigation. Less than a month later, Appellant was arrested for

shoplifting while she had her two youngest children with her. This evidence of Appellant's criminal conduct that resulted in her confinement is relevant to the endangerment analysis. *J.F.-G.*, 627 S.W.3d at 315–17.

Appellant submitted to drug testing once during the pendency of the case, which yielded positive results for methamphetamine. She also tested positive for methamphetamine and opiates during the de novo hearing. Drug use and its effects on the parent's life and ability to parent may demonstrate an endangering course of conduct. *J.O.A.*, 283 S.W.3d at 345; *In re K-A.B.M.*, 551 S.W.3d 275, 286 (Tex. App.—El Paso 2018, no pet.); *In re R.F.*, No. 11-24-00271-CV, 2025 WL 994024, at *8 (Tex. App.—Eastland Apr. 3, 2025, pet. denied) (mem. op.) (citing *J.S.*, 687 S.W.3d at 550 ("Evidence of endangerment is demonstrated in many forms, including . . . alcohol and drug abuse.")). That is because any drug activity or substance abuse may render the parent incapable of parenting. *J.S.*, 687 S.W.3d at 550, 554 (citing *R.R.A.*, 687 S.W.3d at 278). On this record, the trial court could have formed a firm conviction or belief that the children were exposed to illegal drugs, which contributed to the children's endangering environment. *See J.W.*, 645 S.W.3d at 749–50 ("[A] parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment.").

Finally, the children's violent tendencies and threatening behavior support the trial court's endangerment findings. L.M.R. "had to be sedated numerous times" during her two hospitalizations "for telling the staff and the children that she was going to kill them and lash out on them aggressively." The father informed Wooten that he taught the children how to box and encouraged them to fight each other. Appellant claimed that the father was teaching the children "to defend themselves because this world is a cruel place." The children's violent behavior toward their

14

peers, teachers, caregivers, and each other permit the rational inference that they were exposed to violence and aggression in Appellant's and the father's care. *See In re D.J.W.*, 624 S.W.3d 60, 67 (Tex. App.—El Paso 2021, no pet.) ("Domestic violence may support a finding of either environment or course-of-conduct endangerment."); *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)).

To stabilize their behaviors, the children have required extensive care while in the conservatorship of the Department. They are all in some form of trauma-focused therapy and behavioral therapy, and each requires specialized assistance or accommodations in school. L.M.R. was hospitalized twice for threatening to harm others and herself, and was living in a residential treatment facility at the time of the de novo hearing. She will need therapies and other services indefinitely, and requires twenty-four-hour monitoring due to her aggressive behaviors. C.J.H. was also sent to a psychiatric hospital after he attempted to harm his teachers and classmates the day before the de novo hearing. When he is discharged, he will return to the therapeutic foster home where C.O.H. is also placed. Prior to C.J.H.'s hospitalization, he required constant supervision in school "because he's known to hurt his peers"—poking their eyes, choking, throwing things, hitting, and "things like that." The children's behaviors and diagnoses permit the strong inference that Appellant engaged in conduct that endangered the children, or knowingly allowed them to remain in an endangering environment.

Based on the foregoing, the evidence is sufficiently clear and convincing such that a reasonable factfinder could have formed a firm conviction or belief that Appellant disregarded her parental obligations to the degree that she "knowingly

allowed the children to remain in an endangering environment" and "knowingly placed [the children] with persons who engaged in [endangering] conduct." FAM. § 161.001(b)(1)(D), (E); *see J.W.*, 645 S.W.3d at 750.

Accordingly, we overrule Appellant's first issue.

*Best Interest of the Children*

In her second issue, Appellant challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of the children. "'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (quoting *Holley*, 544 S.W.2d at 371–72). We reiterate that the trial court, as the trier of fact, is the sole judge of the witnesses' credibility. *J.F.-G.*, 627 S.W.3d at 312. We are not at liberty to disturb the determinations of the factfinder so long as those determinations are not unreasonable. *Id.* at 311–12; *J.P.B.*, 180 S.W.3d at 573. Giving the requisite due deference to the trial court, we hold that, based on the evidence in the record and the application of the *Holley* factors, the trial court could have formed a firm belief or conviction that termination of Appellant's parental rights was in the best interest of the children. *See Holley*, 544 S.W.2d at 371–72.

Evidence of each *Holley* factor is not required to support a best-interest finding. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *11 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.). In other words, the absence of evidence regarding some of these factors does not preclude a best-interest finding, "particularly if [the] undisputed evidence shows the parental relationship endangered the child's safety." *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.). Consequently, "evidence relating to one single factor may be

16

adequate in a particular situation to support a finding that termination is in the best interests of the child." *J.S.*, 687 S.W.3d at 552 (quoting *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)). And evidence that is relevant to Section 161.001(b)(1) termination grounds may be probative of the child's best interest. *See E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013) (citing *C.H.*, 89 S.W.3d at 28).

The clear and convincing evidence that Appellant endangered the children also established that terminating her parental rights was in the children's best interest. Significantly, Appellant's criminal activity resulted in her arrest and inability to care for the children. Rather than placing her children in a safe environment while she was in custody, Appellant chose to leave them in the care of a known methamphetamine user who had recently abandoned the entire family. Appellant also tested positive for methamphetamine as well as opiates, which posed infinite potential dangers to the children and "implicates most of the *Holley* factors." *In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied). A parent's continuing pattern of drug use can support a best-interest finding due to the "attendant risks to employment, housing, and prolonged absence from the children." *R.R.A.*, 687 S.W.3d at 281. Additionally, the children's behaviors indicate that they witnessed violence in their home. *In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso 2019, no pet.) ("Physical violence in the home leads to an unstable and unpredictable environment for children."); *K.G.*, 2025 WL 477650, at *5.

Appellant never secured and maintained her own stable housing or employment. *See J.W.*, 645 S.W.3d at 742 (considering the parent's unstable and uncertain living situation in upholding the trial court's best-interest finding). During Appellant's brief absence from her children while she and the father were in jail, she

failed to ensure that they were adequately cared for, supported, and protected. *See In re E.P.C.*, 381 S.W.3d 670, 683–84 (Tex. App.—Fort Worth 2012, no pet.) (The parent's failure to provide proper nutrition, leaving the child alone, and his lack of remorse for doing so was evidence of endangerment.). Even after removal, she made no monetary contributions to assist with or provide for her children's upbringing. And Appellant's transient lifestyle and refusal to provide her home address suggests an inability or unwillingness to achieve the permanence and stability that her children need to thrive. *See In re J.A.R.*, 696 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) ("Stability and permanence are paramount in the upbringing of children."). The trial court could have rationally inferred that relinquishing the children to Appellant's care would subject them to a life of uncertainty and instability, which is contrary to their best interest. *See In re E.M.*, No. 11-24-00310-CV, 2025 WL 1240792, at *10 (Tex. App.—Eastland Apr. 30, 2025, no pet.) (mem. op.) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Although Appellant "acknowledge[d] that she did not have stability," she maintained that Larkin's conduct rather than her own led to the children's removal. She also denied any violence in the home prior to the Department's involvement, but ignored the "significant and severe aggressive behaviors in each of her children that are learned behaviors from unstable and chaotic home environment with some form of domestic violence." Appellant attributed her positive drug test results to "hanging around people that were using" methamphetamine, then blamed Larkin. The trial court could consider Appellant's minimization of culpability and her failure to properly address the Department's concerns regarding her lack of safe and stable housing. *See Holley*, 544 S.W.2d at 371–72; *In re E.G.*, 643 S.W.3d 236, 254 (Tex. App.—Amarillo 2022, no pet.) ("Mother's untreated mental health issues gave way

to behavior that resulted in [the child's] removal and constituted conduct that endangered [the child's] physical and emotional well-being."); *In re A.H.*, No. 11-24-00075-CV, 2024 WL 3879987, at *7 (Tex. App.—Eastland Aug. 21, 2024, pet denied) (mem. op.) ("[Mother's] past behavior, minimization of her conduct, [and] drug use . . . permit the rational conclusion that relinquishing [the child] to her care would pose a substantial risk of harm to the child.").

Appellant's failure to complete the tasks and services required by her service plan support the trial court's best-interest finding. *See E.C.R.*, 402 S.W.3d at 249 (A parent's failure to complete court-ordered services can support a best-interest finding.). "A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of [her] child that [she] does not have the ability to motivate [herself] to seek out available resources needed now or in the future." *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Wooten's efforts to arrange drug treatment for Appellant and to address her housing issues were ultimately futile. Appellant also failed to articulate any concrete plan to personally provide for the children. She testified that she was "trying to look for a house that's big enough" for the family, and was "looking for a job." *See J.D.*, 436 S.W.3d at 119–20 ("The fact finder may compare the contrasting plans for a child by the parent and the Department and consider whether the plans and expectations of each party are realistic or weak and ill-defined."). However, Appellant's remote desire to eventually support her children is not enough to alleviate the trial court's and the Department's concerns for the children's safety and well-being. Therefore, Appellant's uncertain living situation and failure to demonstrate the ability to secure stable housing further support the trial court's best-interest finding. *See J.D.*, 436 S.W.3d at 119 ("A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of

parenting skills, and poor judgment may be considered when looking at the children's best interest."); *Holley*, 544 S.W.2d at 371–72.

The trial court could likewise consider the Department's previous involvement with Appellant and the father "for the physical neglect of the shop and trailer"—the same property where Larkin left the children. Knowing that the RV was unsuitable for the children, Appellant nevertheless returned to the property after the Department's initial involvement. And contrary to Appellant's assertion that she bathed the children daily, Campos observed that the children were covered in layers of dirt, which indicated to him that they had not bathed in a long time. Campos's conclusion was corroborated by L.M.R.'s excitement about having food, running water, and daily baths in her foster home. It also appeared to Campos that the children had been sleeping on the dilapidated couch and recliner chair in the shed, and were surrounded by safety hazards. As such, the trial court could rationally infer that Appellant was, at minimum, indifferent to the children's physical health and emotional well-being, given her knowledge of the dangerous living conditions in which she placed her children. Such "evidence of parental indifference weighs heavily in favor of a factfinder's finding that termination is in [the children's] best interest." *In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.); *see also A.H.*, 2024 WL 3879987, at *6 ("Appellant broadcasted the father's ongoing aggression and violence on social media, rather than attempting to protect [the child] from it.").

Appellant only submitted to drug testing once in the years leading up to the de novo hearing, then a second time after being ordered to do so during the hearing. Appellant tested positive for methamphetamine twice and positive for opiates on February 21, 2025. The trial court was permitted to rely on the drug test results in finding that Appellant engaged in illegal drug use, despite Appellant's denials

20

thereof.  *See E.D.*, 682 S.W.3d at 607 (continuing pattern of illegal drug use "implicates most of the *Holley* factors"); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with his family service plan support a finding that termination is in the best interest of the child."); *see also In re T.L.C.*, No. 01-17-00498-CV, 2018 WL 4139004, at *15–18 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. denied) (mem. op.) (considering the mother's decision to leave her four-year-old and eleven-month-old children home alone at night).

Most importantly, given the child-centered focus of the best-interest inquiry, we may not discount the children's improvement since removal.  *See J.W.*, 645 S.W.3d at 746–47.  Wooten explained that the children were in their best placements to provide for each of their specialized needs.  As those needs moderate and stabilize, the Department will continue its search for adoptive placements.  Furthermore, C.O.H. and C.J.H. are too young to express their desires, and the children's ad litem opined that L.M.R. and C.N.H. lacked the intellectual ability to express a rational decision.  Under such circumstances, the factfinder may consider whether the children have bonded with their caregivers, are well-cared for by them, and whether the children have spent minimal time with a parent.  *In re E.J.M.*, 673 S.W.3d 310, 334 (Tex. App.—San Antonio 2023, no pet.); *see also In re N.J.H.*, 575 S.W.3d 822, 834 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (stating that evidence showing that a young child had bonded with foster family supported best-interest finding).  Here, the children's medical and therapy needs that are vital to their recovery and continued improvement are being met in their respective placements. *See In re M.C.L.*, No. 04-21-00277-CV, 2022 WL 219002, at *6 (Tex. App.—San Antonio Jan. 26, 2022, no pet.) (mem. op.) (It is in the child's best interest to be with a foster family that "has been attentive to meet [the child's] needs.").  C.N.H. is

responding relatively well to services, treatments, and interventions, and apologized to Wooten for how he behaved toward her in the past. C.O.H. is improving his self-regulation skills, and L.M.R. has exhibited less aggression toward her teachers and peers. L.M.R. will need continued therapies and intensive long-term care. The trial court could consider the children's access to greater levels of care and resources in their placements in determining their best interest.

Upon considering the evidence as it relates to Appellant's actions and inactions, the emotional and physical danger to the children now and in the future, the emotional and physical needs of the children now and in the future, Appellant's lack of parental abilities and stability, and her criminal conduct and drug use, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Appellant's parental rights is in the best interest of the children. *See J.W.*, 645 S.W.3d at 741; *Holley*, 544 S.W.2d at 371–72.

Accordingly, we overrule Appellant's second issue.

*This Court's Ruling*

We affirm the order of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


August 29, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.